1

2

3

4

5

6

7

8    **UNITED STATES DISTRICT COURT**

9    EASTERN DISTRICT OF CALIFORNIA

10

11   GEOFF EDWIN MURPHY,                     Case No. 1:16-cv-01934-LJO-EPG-HC

12              Petitioner,                  FINDINGS AND RECOMMENDATION
                                             RECOMMENDING DENIAL OF PETITION
13        v.                                 FOR WRIT OF HABEAS CORPUS

14   DEBBIE ASUNCION,

15              Respondent.

16

17        Petitioner Geoff Edwin Murphy is a state prisoner, represented by counsel, proceeding

18   with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner

19   raises the following claims for relief: (1) instructional error; (2) the California Court of Appeal's

20   improper refusal to consider the forfeited instructional error claim; (3) ineffective assistance of

21   counsel; (4) erroneous limitation of expert testimony; and (5) insufficient evidence to sustain

22   first-degree murder conviction.

23        For the reasons discussed herein, the undersigned recommends denial of the petition for

24   writ of habeas corpus.

25                                          **I.**

26                                     **BACKGROUND**

27        On July 7, 2014, Petitioner was convicted by a jury in the Kern County Superior Court of

28   first-degree murder (count 1), making criminal threats (count 2), and two counts of elder abuse

(counts 3, 4). (2 CT[1] 456, 464, 466). Petitioner was sentenced to an indeterminate term of 25 years to life plus 25 years on count 1, and a determinate term of 53 years and 8 months on counts 2, 3, and 4. (3 CT 638, 640). On July 14, 2016, the California Court of Appeal, Fifth Appellate District affirmed the judgment. <u>People v. Murphy</u>, No. F069891, 2016 WL 3885051, at *15 (Cal. Ct. App. July 14, 2016). The California Court of Appeal denied rehearing on July 25, 2016. (LDs[2] 5, 6). Petitioner filed both a petition for review and a state habeas petition in the California Supreme Court. (LDs 7, 9). The California Supreme Court summarily denied both petitions on October 19, 2016. (LDs 8, 10).

On December 28, 2016, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). Respondent has filed an answer to the petition, and Petitioner has filed a traverse. (ECF Nos. 12, 15).

## II.

## STATEMENT OF FACTS[3]

Appellant is the son of James and Barbara Murphy. He grew up in Bakersfield, took some college courses there after graduating from high school, and served in the United States Army from 2003 to 2005 before receiving a general discharge under "other than honorable" conditions. He later sought treatment for alcohol dependency, married a woman whom he met through Alcoholics Anonymous, and relocated to Vallejo. In early 2009, appellant experienced what is described in the record as a significant "psychotic episode" and was hospitalized for mental health care. He thereafter received psychiatric treatment on a regular basis from March 2009 through June 2013.

In July 2013, after separating from his wife, appellant moved back to Kern County to live with his parents. According to Barbara Murphy, appellant showed signs of depression during the initial weeks of his stay, e.g., crying and expressing regret for having wasted much of his adult life. With the exception of a one-month stint working as a security guard at an amusement park, he had spent the past several years unemployed and living off his wife's disability income.

On July 16, 2013, appellant's father took him to a mental health facility in Bakersfield known as the Mary K. Shell Center. The purpose of this visit was to find a local doctor who could prescribe medication for appellant's psychiatric conditions. Appellant returned to the same facility on July 30, 2013, but it is unclear from the record what services he received on that date, if any. A former roommate in Vallejo told Barbara Murphy that appellant had obtained a month's supply of medication before leaving for Bakersfield, but Mrs. Murphy was not

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on April 20, 2017. (ECF No. 13).
[2] "LD" refers to the documents lodged by Respondent on April 20, 2017. (ECF No. 13).
[3] The Court relies on the California Court of Appeal's July 14, 2016 opinion for this summary of the facts of the crime. See <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

aware of him taking any psychotropic medicine while he was living with her that summer.

Appellant's depression improved toward the end of July, but the change coincided with new patterns of delusional and paranoid behavior. He claimed that the Department of Homeland Security was recruiting him for an analyst position and had offered him a $25,000 signing bonus to accept the job. Appellant also believed the government was monitoring him through cameras and by aerial surveillance.

On July 30, 2013, shortly before midnight, James Murphy made a 911 call for police assistance due to appellant's persistent interrogation of his mother about a conspiracy theory involving a photograph taken of him as a baby. The dispatcher advised there would be a delayed response because the police had other priorities. At 2:18 a.m., James Murphy contacted law enforcement to cancel his earlier request, since appellant had by then calmed down and the family was ready to go to sleep.

Appellant's behavior worsened during the first week of August. He began to act as if his parents' home was a military installation and he was the commanding officer, claiming that he outranked his parents and thus had control over the premises. The assertion was nonsensical for a variety of reasons, not the least of which being that, in contrast to appellant's inglorious military experience, his father had achieved the rank of Major over the course of a 23–year career in the Army. Nevertheless, appellant posted a list of "rules" advising his parents of things they were forbidden from doing in their own house without his permission.

On August 8, 2013, appellant's parents secretly met with an attorney to start the process of obtaining a restraining order and having appellant removed from their home. The lawyer agreed to file the necessary paperwork, but allegedly told Mr. and Mrs. Murphy it was doubtful that a judge would rule in their favor because appellant had not physically assaulted them. Later that evening, the couple's niece, Gwenn Maher, showed James Murphy how to make video recordings on his iPhone. Together they devised a plan to surreptitiously record appellant's behavior, with the goal of being able to provide the authorities with evidence of his dangerousness. Mr. Murphy implemented the plan immediately, recording his niece as she left the house and keeping the device running while he and his wife watched television. The recording lasted for over 33 minutes, but appellant did not enter the room during that time.

On August 10, 2013, James Murphy captured video footage of appellant berating his mother for refusing to drive him to the grocery store. Mr. Murphy allowed the argument to go on for approximately seven minutes before shooting appellant with a nine-millimeter handgun, which had theretofore been concealed on or near his person. Barbara Murphy called 911 and told the dispatcher, "My husband just shot my son.... My son is crazy. He's manic depressive [and] he's off his medications." Meanwhile, appellant overpowered his father, took control of the gun, and killed him.

The Kern County District Attorney charged appellant by information with premeditated first degree murder (Pen. Code, §§ 187, 189; count 1), making criminal threats against Barbara Murphy (§ 422; count 2), and committing acts of elder abuse against both of his parents (§ 368, subd. (b)(1); counts 3 & 4)). An enhancement allegation was included with the murder count for personal and intentional discharge of a firearm resulting in death (§ 12022.53, subd. (d)).

Appellant pleaded not guilty to all charges, but apparently made no attempt to raise an insanity defense. The case went to trial in June 2014.

The prosecution built its case around a 28–minute video recorded on the morning of August 10, 2013. As mentioned, the subject incident was documented on an iPhone, which James Murphy had placed in an upright position behind where he was sitting when the events unfolded. The video shows Barbara Murphy, then 69 years old, lounging in a recliner located across from Mr. Murphy and to his left-hand side. The camera remains stationary during most of the recording, facing toward the interior entryway of the house, and the angle is just wide enough to show the front of Barbara Murphy's chair. She spends much of the video sitting or reclining, so viewers often see only her legs.

Barbara Murphy had promised to take appellant to the grocery store earlier that morning, but asked him to wait for one hour while she rested. The defense would later argue Mrs. Murphy had no real intention of driving him to the store, but agreed to do so knowing he would become angry and lash out when she went back on her word. In any event, the video begins with appellant's parents having a private conversation in their living room:

Barbara: Do you have a plan?

James: I don't—

Barbara: How do you want to proceed on this?

James: Hmm?

Barbara: How do you want to proceed on this?

James: He's got to physically assault one of us.

Barbara: No, he doesn't.

James: Well, there's no way—other way to stop it other than when you—by calling 9–1–1, yeah. We hope.

Barbara: They—

James: They still have to get here before he does something.

Barbara: I would like you to record if you could. Alright?

James: I have it on.

Barbara: Okay. Because if they come out and he's reasonable we just look like we're stupid.

James: What?

Barbara: If we don't record something and he does not assault us we're going to look stupid if we don't have a recording to show what's going on.

Following this discussion, Mr. and Mrs. Murphy briefly chat about unrelated topics and then remain silent for nearly eight minutes. Appellant can be seen

4

walking in and out of the room during this interval. It is apparent from the video that he is a large and physically fit man. Elsewhere in the record, appellant is described as being 6'2" and weighing between 220 and 230 pounds. James Murphy was similar in size, standing at 6'1" and weighing 206 pounds, but the age difference between father and son was more than 40 years.

Appellant's argument with his mother occurs while Barbara Murphy is seated in her recliner and appellant is standing in front of her, though he sometimes paces about the room. The following excerpts contain most of their seven-minute conversation, with slight modifications to the transcript for purposes of readability and annotations regarding the parties' respective movements. Appellant generally speaks in a conversational tone, but there are times when he suddenly screams at the top of his voice. The latter instances are denoted with capitalized type, both here and in the original transcript.

Appellant: About ready?

Barbara: No.

Appellant: Well, uh, you want to go?

Barbara: No.

Appellant: You don't want to go?

Barbara: Geoff, I'm not feeling good.

Appellant: Alright, so I'll just go.

Barbara: You're not going to just go.

Appellant: How the fuck are you going to tell me that? I want to go. And you guys can just stay here and do your thing, but I need some things that I need to take care of.

Barbara: Like what?

Appellant: None of your fucking business. How about the groceries? How about a couple of things? I don't have much time here. I don't. [Turns to address James Murphy] Care to weigh in dad? Father? So—

Barbara: Your dad said—

Appellant: —anyway—

Barbara: Dad said to make a list—

Appellant: I['ve] got a list. You're not going to get my list. I'm going to go. So either you're up now or what.

Barbara: I want to—

Appellant: I'm not going to sit here and do this. This [-] you're [not a] child. You're older than me, okay. You know what the fuck I'm saying, it's

coming out [of my mouth]. We're going. Now. Me and you.... Five minutes.

Barbara: I'm not going to be ready.

Appellant: Well then give me the keys 'cause I'm going.

Barbara: No, I'm not giving you the keys.

Appellant: Well then I'm calling the fucking police.

Barbara: Call the police.

Appellant: You ready for that?

Barbara: Yeah.

Appellant: Alright good. Oh, that's right you guys have already tried. Didn't, didn't work out did it? [Apparently referring to the 911 call made on July 30, 2013.]

Barbara: Yeah, you probably aren't going to get any further than I did.

Appellant: Oh, isn't that interesting. You think so?

...

Appellant: Yeah, so you about ready?

Barbara: No.

Appellant: [Unintelligible statement.] BITCH THIS IS A PRISON!

[James Murphy leans forward in his chair and reaches toward the lower middle section of his back with his right hand.]

Barbara: No, it's not.

Appellant: YOU DO WHAT I SAY! ... Why are you being so fucking combative? [Voice becomes calm again.] I see you're tired [and] not feeling well, why don't you just give me [the] car and give me a few bucks and I'll go take care of it.

Barbara: Geoff we had such a nice day yesterday.

Appellant: I don't give a shit. I hope it was wrecked with thoughts about how fucking terrible this can continue to be, should you continue on like this. Let's go.

Barbara: Geoff—

Appellant: GEOFF WHAT?! Let's go.

[James Murphy sits back in the chair and crosses his legs.]

6

Appellant: That's right, you've got an order. You want to disobey the whole fucking United States right now?

Barbara: Yeah, I'd like to see it in writing.

Appellant: [Raising his voice again] I have it in writing bitch. It's right here.

Barbara: Well go show me.

Appellant: You're not going to get anything, 'show me,' this ain't the "Show Me State!"

[Barbara Murphy finds this comment amusing.]

Appellant: Yeah, that's a good one actually.

Barbara: [Chuckles] It was quite funny. I, I don't know why you can't wait.

Appellant: Why do I need you? You fucking forgot, all you are right now is [a] goddamn checkbook.

Barbara: Well that might be—

Appellant: [Mimicking his mother] "That might be." You don't have word edgewise. You want me to shut you down totally? [Raising his voice] Shut up. You're the one I got to get through [to], Dad already gets it. He's ex-military so he knows what to do. He knows fucking better. You don't do what you're doing right now to me.

Barbara: What am I doing?

Appellant: I'm giving you a fucking order bitch. That means let's get up and go. That either means when I said five minutes I'm ready to go and I saw your ass standing over here—at or—

Barbara: Excuse me.

Appellant: —or what?

Barbara: You already and I already agreed an hour.

Appellant: Well it's been an hour....

Barbara: It hasn't—

Appellant: It's 8:12 [a.m.], we're about ten minutes off. I remember it was 7:26 when we made this agreement....

...

Appellant: It's time. You're awake. You're aroused. Let's go.

Barbara: No, I'm not.

7

Appellant: Well then bitch you better move and give me the keys. [Raises voice] You've had enough?! Give me the keys then or we're going in five minutes.... Wipe your ass and we're going in five minutes or you give me the keys or I will fucking call the police and tell them to come here.

Barbara: Okay, call them now.

Appellant: Fuck you. I'll call them when I'm ready.

[Barbara Murphy attempts to say something and appellant interrupts her twice with nonverbal outbursts.]

Barbara: You aren't going to call [them].

Appellant: I'll stomp your ass and they won't even fucking do anything about it. You know how sick that is?

Barbara: Why would you stomp my ass?

Appellant: Because you're being a little shit. I'm not your daddy. [Leans down toward Barbara's face] I'm [your] fucking son come HELLBOUND BITCH!

Yeah, I'm yelling at you. I don't care if you bore me, you don't even fucking give me a real baby picture. I know who [that is]. I remember Jason [referring to his younger brother] getting wheeled in the fucking stroller bitch. I was three and a half [years old,] yeah. I had memory then, remember I was talking at one! REMEMBER BITCH? [leans closer to her face] I AM THE ANTICHRIST! FUCK YOU!

Barbara: Geoff, please.

[Appellant begins pacing about the room, eventually moving off camera.]

Appellant: I am the antichrist motherfucker, if you ever thought about it.

Barbara: What exactly is—

Appellant: SHUT UP.

Barbara: —is the antichrist?

Appellant. Five minutes!

Barbara: No.

Appellant: [Mimicking his mother] "No." I told you this is a prison. I got shanked right here bitch. You ready to take me on?

[Appellant walks back into the room holding an elongated lighter in his right hand, i.e., the type of device used to light a grill or fireplace.]

Maybe I'll just knock you upside the fucking head first. [Moves directly in front of his mother's chair and punches the air.] YOU READY FOR THAT?! [Barbara flinches and raises her arm in a defensive posture.]

Barbara: No.

Appellant: [Mimicking his mother] "No."

Just like I had to fucking whine [pokes Barbara in the stomach with the lighter]. Just like that. [Swats her leg with the lighter two times.]

Barbara: Stop hitting me!

Appellant: Just like that.

Barbara: Okay.

[Appellant moves approximately six steps away from Barbara and goes out of view. James Murphy repositions himself and leans forward in his chair.]

Appellant: [Speaking to his father] Major, don't even think about it. I'll do you next. You're my favorite. [Walks back into view of the camera.]

Barbara: Why don't you put that thing away. Don't hit me.

Appellant: I didn't hit you.

Barbara: You did too. You poked at me.

Appellant: [Pacing around the room] You battered the fuck out of me as a child, [even] kicked me in the balls, so fuck you.

Barbara: I never kicked you—

Appellant: Fuck you I have a better memory than you. It's eidetic. E–D–E–

Barbara: I did not kick you in the balls.

Appellant: E–I–D–E–T–I–C, excuse me.

...

Barbara: Don't you remember when you broke my finger?

Appellant: [Standing a few feet away from the front of his mother's chair] That was so good. You deserved it. You little bitch. You were slapping me while I was driving. Fuck you.

Barbara: Uh, you almost—

Appellant: Fuck you.

[At this point appellant extends his right arm and ignites the lighter. He pauses, takes a step closer, then extinguishes the flame.]

Barbara: Stop that.

Appellant: Fuck you.

Barbara: Okay.

As Barbara Murphy says "okay" for the last time, appellant drops his hand to his side and starts to turn away from her. A second later, James Murphy says, "That's enough," then rises out of his chair and shoots appellant in the middle of his chest. Appellant recoils in pain and lets out a yell as James Murphy aims the gun a second time. Before he can fire another round, appellant lowers his left shoulder and charges at him, trying to wrap his right arm around his father's upper body as the two of them move off camera.

The men disappear from view at approximately 18 minutes and 28 seconds into the video. During the next 10 seconds, appellant laughs and says, "You shot me? Are you serious? Are you fucking serious motherfucker?" While this is happening, Barbara Murphy gets out of her chair, fumbles with a cordless telephone, and walks out of the house amid the sounds of a struggle. As she closes the door behind her, appellant can be heard saying, "I'm gonna kill you. I'm gonna kill you." He then asks, "How'd you get this gun?" This is followed by approximately 30 more seconds of audible combat. The viewer/listener hears the unmistakable sound of blows being landed, interspersed with grunting, heavy breathing, and further laughter on appellant's part, with statements by him that include, "Fuck you, motherfucker," a comment about his father's rolling "eyeballs," and words to the effect of, "You think you give me clearance motherfucker?"

When the video counter reaches 19 minutes and 17 seconds, appellant whispers what sounds like "Dad" or "Daddy," repeats himself a few seconds later, then raises his voice and says, "Enough. Enough's enough. Enough I said!" There is another five seconds of movement and grunting, followed by a gunshot.

Immediately after the shot is fired, appellant says, "Now you're dead." He pauses, and repeats, "Now you're dead. Told you." Appellant comes back into view about 35 seconds later. Holding the gun by its barrel, he stands in front of a mirror and lifts up his shirt to examine the bullet wound to his chest, remarking, "That ain't good." Continuing to talk out loud, appellant mutters, "He shot me. I killed him. [Unintelligible statements] Bye. Made a mistake."

Next, appellant retrieves a telephone and tries to call 911, not realizing his mother is already on the line with a dispatcher. When the dispatcher asks who is speaking, he identifies himself, says "I need you over here now," and explains that his father shot him in the chest. When asked where his father is, appellant replies, "He's on the floor." The dispatcher asks three times if appellant's father has been shot, but appellant ignores those questions. He tells the dispatcher to "hurry" before hanging up the phone. As the video draws to a close, appellant can be heard talking to himself: "... He tried to kill me. He did. I don't know if it's going to work, [but it] might."

Testimony from the pathologist who performed an autopsy on James Murphy's body revealed that a "muzzle imprint" was found on the side of the decedent's head, indicating the gun was pressed against his skin when it was fired. The bullet entered the left side of the skull, passed straight through the brain, and exited out the other side. The pathologist's testimony further confirmed, as did post-mortem photographs, that James Murphy sustained "blunt force trauma" to his head and body prior to being shot. An assortment of abrasions, contusions, and lacerations were visible throughout the face, chest, arms, and legs. The extensive bruising led

the pathologist to conclude the victim had been struck multiple times prior to his death.

Since appellant was not found to have any injuries other than those related to his gunshot wounds, the prosecution argued that the fight between James Murphy and his son had been one-sided, and appellant's use of deadly force unjustified. The bullet that went through the victim's head was found lodged in a baseboard near his body, which the prosecution cited as evidence of the bullet's trajectory, the parties' respective positions at the time of the shooting, and proof of an "execution style" killing. Accordingly, the jury was urged to find appellant acted with deliberation and premeditation.

Appellant's trial counsel argued for an acquittal on grounds of perfect self-defense. The argument was presented as part of a broader theory that James and Barbara Murphy had essentially conspired to murder their son, and antagonized him in order to manufacture a justifiable homicide defense for themselves. This theory was summarized in closing argument: "[James Murphy] was waiting for Geoff to physically assault one of them. He was waiting for that right moment....That sounds a lot like premeditation and deliberation, not from Geoff, but from his parents. They were waiting for the right moment to shoot him."

In support of its position, the defense pointed to the video created on August 8, 2013, two days prior to the victim's death. During that recording, Barbara Murphy asks her husband, "Jim, did you get the baseball bat out?" He responds affirmatively, and she inquires about its location. Defense counsel argued that "bat" was the couple's code word for gun.[4] The same video appears to show an object concealed in the back waistline of James Murphy's pants, possibly a firearm, suggesting that he contemplated shooting appellant well in advance of the subject incident. The defense further noted Barbara Murphy's behavior in the moments after her son had been shot, which could fairly be interpreted as showing a lack of surprise and urgency. She had no verbal reaction to the shooting, showed the presence of mind to reach for the cordless phone almost immediately, and exited the house in an arguably casual manner.

As for the self-defense argument, counsel relied on appellant's warnings of "enough" that were issued seconds before the fatal shooting. The defense hypothesized that James Murphy retained possession of the firearm while fighting with his son and continued to struggle against him during the final moments of his life. Construing the physical evidence differently than the prosecution, counsel argued that "James was on top of Geoff and still [had] the upper hand" immediately prior to being shot.

Appellant raised an issue of diminished actuality by introducing evidence of a mental disorder in conjunction with the argument that he never formed the specific intent required for first degree murder. Luis Velosa, M.D., a retained psychiatrist, testified to appellant's affliction with bipolar disorder, which is a mental illness that can produce symptoms of depression, mania, and psychosis. Dr. Velosa opined that appellant was suffering from "bipolar disorder with

---

[4] At trial, Barbara testified that she and her husband kept two firearms stored in an attic space over the garage, and claimed she did not know James Murphy had retrieved one of those guns until the moment he shot appellant on the morning of his death. She also explained that her husband had been sleeping with a baseball bat next to his side of the bed in case appellant tried to attack them in the middle of the night. However, homicide investigators did not report finding a baseball bat during their search of the home.

psychotic symptoms" when he killed his father. We further summarize the expert's testimony in the Discussion, *post*.

Murphy, 2016 WL 3885051, at *1–8 (footnote in original).

## III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. The Court looks to the last reasoned state court decision as the basis for the state court judgment. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

**IV.**

**REVIEW OF CLAIMS**

**A. Instructional Error**

In his first claim for relief, Petitioner asserts that the trial court erred by instructing the jury on justifiable attempted homicide by the victim. (ECF No. 1 at 4; ECF No. 1-2 at 20).[5] Petitioner argues that because the instruction eliminated Petitioner's right to self-defense, there was a denial of due process. (ECF No. 1-2 at 20). Respondent contends that Petitioner's instructional error claim is defaulted, and in any event, fails on the merits. (ECF No. 12 at 27).

1. Procedural Default

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and

---

[5] Page numbers refer to the ECF page numbers stamped at the top of the page.

adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This

doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32.

However, there are limitations as to when a federal court should invoke procedural default and

refuse to review a claim because a petitioner violated a state's procedural rules. Procedural

default can only block a claim in federal court if the state court "clearly and expressly states that

its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989). A

petitioner "may obtain federal review of a defaulted claim by showing cause for the default and

prejudice from a violation of federal law." Martinez v. Ryan, 566 U.S. 1, 10 (2012) (citing

Coleman, 501 U.S. at 750).

The instructional error claim was raised on direct appeal to the California Court of

Appeal, Fifth Appellate District, which declined to exercise its discretion and review the

forfeited claim. Murphy, 2016 WL 3885051, at *9. The instructional error claim also was raised

in the petition for review in the California Supreme Court, which summarily denied the petition.

(LDs 7, 8). In determining whether a state procedural ruling bars federal review, the Court looks

to the "last reasoned opinion on the claim." Ylst, 501 U.S. at 804. Therefore, the Court will "look

through" the California Supreme Court's summary denial and examine the decision of the

California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the claim, the California Court of Appeal stated:

> The Attorney General rightfully contends that all claims of
> instructional error have been forfeited. Failure to object to a jury
> instruction forfeits the claim on appeal. (*People v. Virgil* (2011) 51
> Cal.4th 1210, 1260.) In his reply brief, appellant cites to authorities
> that address circumstances under which an appellate court may
> consider forfeited claims on their merits, apparently inviting us to
> exercise such discretion in this instance. We decline to do so.

Murphy, 2016 WL 3885051, at *9. As the California Court of Appeal clearly and expressly

stated that its decision on the prosecutorial misconduct claim rests on a state procedural bar,

procedural default is appropriate if the state procedural bar is independent and adequate.

However, in his second claim for relief, Petitioner asserts that he was denied due process and

equal protection by the California Court of Appeal's refusal to address Petitioner's forfeited

instructional error claim. (ECF No. 1 at 4; ECF No. 1-2 at 28).

Ordinarily procedural bar issues are resolved first, but courts have recognized that "[p]rocedural bar issues are not infrequently more complex than the merits issues . . . so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)). Accordingly, the Court will proceed to review the claim *de novo*. See Cone, 556 U.S. at 472.

2. Merits Analysis

Here, the instructions at issue concern justifiable attempted homicide by the victim. The trial court gave the following modified versions of CALJIC No. 5.13 and 5.14:

> Attempted homicide is justifiable and not unlawful when committed by any person in the defense of himself or another if he actually and reasonably believed that the individual he attempted to kill intended to commit a forcible and atrocious crime and that there was imminent danger of that crime being accomplished.
>
> A person may act upon appearances whether the danger is real or merely apparent.
>
> The reasonable ground of apprehension does not require actual danger, but it does require:
>
> One, that the person attempting to kill another be confronted by the appearance of a peril such as has been mentioned;
>
> Two, that the appearance of peril aroused in his mind an actual belief and fear of the existence of that peril;
>
> Three, that a reasonable person in the same situation, seeing and knowing the same facts, would justifiably have and be justified in having the same fear;
>
> And, four, that the attempted killing be done under the influence of that fear alone.

(7 RT[6] 918; 3 CT 536–37). The trial court also gave a definition of what constitutes a forcible and atrocious crime. (7 RT 919; 3 CT 539).

---

[6] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on April 20, 2017. (ECF No. 13).

The trial court also gave the following modified version of CALJIC 5.50.1 regarding prior threats by defendant:

> Evidence has been presented that on prior occasions the defendant threatened James Murphy and Barbara Murphy.
>
> If you find that this evidence is true, you may consider that evidence on the issues of whether James Murphy actually and reasonably believed his or Barbara Murphy's life or physical safety was in danger at the time of the commission of the attempted homicide of the defendant.
>
> In addition, a person whose life or safety has been previously threatened by another is justified in acting more quickly and taking harsher measures for self-protection from an assault by that person than would a person who had not received from the same person.

(7 RT 921; 3 CT 543).

A federal court's inquiry on habeas review is not whether the challenged instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Middleton v. McNeil, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id. The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (internal quotation marks omitted) (quoting Cupp, 414 U.S. at 147).

Petitioner does not argue that the instructions contained incorrect statements of state law. Rather, Petitioner contends that there was no factual basis to give the instructions because there was no imminent danger that Petitioner was going to commit a forcible and atrocious crime, and thus, giving the instructions effectively deprived Petitioner of due process by shifting the prosecution's burden to show the absence of self-defense. (ECF No. 1-2 at 20–21). The trial court explicitly instructed:

> Evidence has been presented that on prior occasions the defendant threatened James Murphy and Barbara Murphy.

> If you find that this evidence is true, you may consider that evidence on the issues of whether James Murphy actually and reasonably believed his or Barbara Murphy's life or physical safety was in danger at the time of the commission of the attempted homicide of the defendant.

(7 RT 921; 3 CT 543). Thus, the trial court made clear that the challenged instructions were only pertinent if the jury finds to be true that on prior occasions Petitioner threatened his parents. Further, the jury was instructed with CALJIC No. 17.31, which provides:

> The purpose of the Court's instructions is to provide you with the applicable law so that you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you find to be the facts.

> Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given I am expressing an opinion as to the facts.

(8 RT 1128; 3 CT 599).

In a case involving a similar issue, the United State District Court for the Northern District of California denied habeas relief on a claim challenging the state trial court "instructing a jury with a factually inapplicable but accurate statement of state law." Fernandez v. Montgomery, 182 F. Supp. 3d 991, 1011 (N.D. Cal. 2016) (applying AEDPA deference). The Fernandez court relied on the following language from Griffin v. United States:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law— whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence[.]

Fernandez, 182 F. Supp. 3d at 1011 (quoting Griffin v. United States, 502 U.S. 46, 59 (1991)). Griffin upheld a general guilty verdict where one of the possible bases of conviction, while legally valid, was not supported by adequate evidence. The reasoning in Griffin supports the conclusion that if there was no factual basis to instruct the jury on justifiable attempted homicide by the victim, the jury would disregard the instruction and render said instruction harmless.

Based on the foregoing, the Court finds that the justifiable attempted homicide instructions did not so infect the trial with unfairness as to deny due process. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

Having found that Petitioner is not entitled to habeas relief on his instructional error claim, the Court further finds that any error in the California Court of Appeal's refusal to address said claim was not prejudicial. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

**B. Ineffective Assistance of Counsel**

In his third claim for relief, Petitioner asserts that trial counsel was ineffective for failing to object to CALJIC 5.13, the justified attempted homicide instruction. (ECF No. 1 at 5; ECF No. 1-2 at 32). Respondent argues that a fairminded jurist could reasonably concur with the California Supreme Court's denial of the claim. (ECF No. 12 at 45–46). This claim was raised in Petitioner's state habeas petition, which was summarily denied by the California Supreme Court. (LDs 9, 10). Here, there was no reasoned opinion on the ineffective assistance of counsel claim, and the Court presumes that the claim was adjudicated on the merits. See Richter, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Accordingly, the Court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then [the Court] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

1. Strickland Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel

made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting Burt v. Titlow, 134 S. Ct. 10, 13 (2013)). When this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

2. Analysis

Based on the analysis in section IV(A)(2), *supra*, Petitioner has not established that there is "a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694. As discussed above, even if there was no factual basis to instruct the

jury on justifiable attempted homicide by the victim, the jury would have disregarded the instruction and rendered said instruction harmless. The Court has found that the justifiable attempted homicide instructions did not so infect the trial with unfairness as to deny due process. Therefore, under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, the California Court of Appeal's denial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

### C. Limitation of Defense Expert's Testimony

In his fourth claim for relief, Petitioner asserts that the trial court violated his due process rights by striking and restricting portions of the testimony of the defense's mental health expert. (ECF No. 1 at 5; ECF No. 1-2 at 35). Respondent argues that the state court's denial of this claim was not contrary to clearly established federal law. (ECF No. 12 at 48). This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 7, 8). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's due process claim with respect to the limitation of the defense expert's testimony, the California Court of Appeal stated:

**Limitation of Expert Witness Testimony**
During a break in the expert testimony of Dr. Velosa, the trial court heard arguments regarding a previously overruled objection to a question and answer given by the witness on direct examination. Upon further consideration, the court struck the challenged testimony. Appellant claims this decision was erroneous and ultimately swayed the jury's verdict on the issues of malice and premeditation. We need not determine the propriety of the trial court's ruling since the alleged error was harmless under any standard of prejudice.

*Background*
Dr. Velosa's trial testimony provided a summary of what bipolar disorder is and

how the condition manifests itself. In his words, it is "a major psychiatric illness" caused by an absence or disturbance of neurotransmitters, which are chemicals in the human brain. The resulting chemical imbalance produces symptoms that can include mood swings ranging from extreme depression to extreme mania, hence the formerly used labels of manic depression and "manic depressive illness." The more acute the chemical imbalance, the more severe the symptoms may be; the worst sufferers can experience racing thoughts, intense agitation, paranoia, delusional beliefs, and psychosis.

In forming his expert opinions, Dr. Velosa reviewed and relied upon appellant's medical records; watched the August 10, 2013 video of appellant interacting with his parents; and evaluated appellant in person on November 22, 2013 and again on June 18, 2014, approximately two weeks prior to his trial appearance. He diagnosed appellant as suffering from "bipolar disorder with psychotic symptoms," meaning "the extreme level of bipolar disorder where the person gets so impaired that he start[s] developing psychotic symptoms." Those symptoms were in remission at the time of Dr. Velosa's face-to-face evaluations because appellant's condition had been stabilized through a regimen of antipsychotic, antidepressant, and antianxiety medications administered to him while he was in custody.

The expert was asked to provide opinions regarding appellant's mental health in August 2013 based on a review of the video footage and the list of rules appellant had posted in his parents' home. Speaking to the latter item, Dr. Velosa said, "[T]his particular document written by the defendant is sort of a classic document of a person who is suffering from paranoi[a] and delusions and ideas of grandiosity," all of which are characteristic of bipolar disorder. After being asked to make a diagnosis based on appellant's behavior toward his mother, the expert testified as follows: "[The] best way to answer this question would be it confirmed visually my clinical opinions that the defendant at the time of the alleged offense was suffering from a psychiatric disorder classified as a bipolar disorder with psychotic symptoms. It confirmed it.... And I must say that his whole behavior was so psychotic. Every single—I mean, the way he approached the whole situation. The way that he was treating his parents. The barbecue lighter. The things that he was saying [were] totally psychotic."

Appellant's claim on appeal is based on a subsequent exchange between Dr. Velosa and defense counsel:

Dr. Velosa: The visual part, there's no question in my mind the defendant was under some sort of a grandiose, paranoid delusion[ ] extremely, which is part of the psychotic symptoms. The anger, the type of situation. [She's] defying the United States government just because he doesn't go [to] a grocery store.

Counsel: And the agitation as well?

Dr. Velosa: That's what is psychotic about it. Yes.

Counsel: Can bipolar disorder lead to impulsive behavior?

Dr. Velosa: Yes.

...

Counsel: Are people who are—are people who are experiencing a manic episode more impulsive than normal, for example?

Dr. Velosa: I would qualify [that] in our terminology we have impulsivity and we have agitation, which is the highest level of impulsivity. When a person is agitated that's what perhaps is not just impulsive. [The] person is thoroughly agitated. Whatever the person is doing at that level. That's not any reflection of wha—of—it just explodes. Just do it without any reflection for the consequences or anything like that. And that's the agitative level. That's why we have, unfortunately, psychiatric hospitals. Because when the person comes to that level of agitation, not just plain impulsivity, they need to be in a psychiatric unit.

Counsel: And would it be fair to describe the behavior that Geoff—the interaction with Geoff and his mother, could that be impulsive?

Prosecutor: I'm gonna object. That's asking the ultimate question of fact.

Trial Court: Overruled. You may answer.

...

Dr. Velosa: The highest of the impulsive level, the agitated behavior, indeed.

The prosecution later renewed its challenge to the admissibility of the final answer in the above-quoted exchange. Before the court heard argument on that issue, defense counsel elicited additional testimony relating to the question of deliberation and premeditation. Counsel asked, "On August 10th of last year, from the video that you saw... Is it possible that Geoff planned his conduct?" Dr. Velosa replied "No." The expert was then asked if appellant's bipolar disorder, as evident from the video, affected his reasoning. Dr. Velosa's response was "Yes."

The prosecution argued that Dr. Velosa's testimony regarding appellant's level of impulsivity was tantamount to an opinion regarding whether appellant acted with the mental state required for first degree murder. The trial court was not entirely persuaded by this argument, but nevertheless decided to strike the challenged testimony and allow defense counsel to rephrase her original question. The jury was admonished as follows: "I am striking part of the witness's testimony from this morning's session. The witness had testified about his opinion as to whether the defendant was acting impulsively at the time of the incident that's depicted in the video involving he and his mother. The witness did express an opinion that the defendant was acting at the highest level of impulsive behavior with his mother. I'm striking that testimony, which means you must disregard it and treat it as if it had not been spoken."

Following the admonishment, defense counsel successfully elicited the following testimony:

Counsel: During the video when Geoff was yelling profanities at his mother in her face, was that an episode of manic bipolar disorder?

Dr. Velosa: Yes.

Counsel: When—during the video when Geoff had the lighter in his mother's face was that also an example of manic episode of bipolar disorder?

Dr. Velosa: Yes.

Counsel: Does the fact that someone has bipolar disorder manic episode, does that have significant impact on someone's thought process?

Dr. Velosa: Yes.

Counsel: And does that affect their ability to plan?

Dr. Velosa: Yes.

Counsel: Hypothetically speaking, if someone gets shot and then after that they are laughing and giggling, is that an example of a psychotic or manic episode?

Dr. Velosa: It is definitely an abnormal reaction after such a serious traumatic event. Whether it is psychotic in nature or manic in nature I'm not—it's thoroughly unusual.

Counsel: Okay. The encounter between Geoff and his mother—the encounter between Geoff and his parents, could that result—could it result in an impulsive reaction from Geoff's mental condition?

Dr. Velosa: Yes.

...

Counsel: Just to—just to clarify—just to be more specific, someone—and correct me if I'm wrong. Someone who is psychotic is rational or not rational?

Dr. Velosa: Irrational. Irrational.

*Analysis*

Because appellant did not raise an insanity defense, there was (and is) a conclusive presumption of his mental capacity to commit the crimes for which he was convicted. (§ 1016, subd. 6; *People v. Elmore* (2014) 59 Cal.4th 121, 141, fn. 12. (*Elmore*).) He chose to present arguments concerning the distinct concept of "diminished actuality," which is a term used to describe the limited defense authorized by section 28. "This provision states that evidence of mental disorders is admissible 'on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged' ... [Citation.] Section 28(a) bars evidence of the defendant's *capacity* to form a required mental state, consistent with the abolition of the diminished capacity defense." (*Elmore, supra*, 59 Cal.4th at p. 139, original italics, fn. omitted.)

Section 28, subdivision (d) provides: "Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense." A related statute, section 29, circumscribes the permissible scope of expert testimony in support of a diminished actuality defense.[7] Simply put, the expert cannot express an opinion as

[7] "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which

to whether the defendant had the mental state required for the charged offense at the time of its commission. (*People v. Mills* (2012) 55 Cal.4th 663, 672, fn. 4.)

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) This standard applies to a ruling on the admissibility of expert testimony under section 29. (*People v. Pearson* (2013) 56 Cal.4th 393, 443-444 (*Pearson*).) The improper exclusion of expert testimony is an error of state law and subject to the test for prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (See *People v. Jones* (2012) 54 Cal.4th 1, 63, 67–68.) Appellant alleges that the trial court's ruling implicated his constitutional right to present a defense, but case law holds otherwise: "Where a trial court's erroneous ruling is not a refusal to allow a defendant to present a defense, but only rejects certain evidence concerning the defense, the error is nonconstitutional and is analyzed for prejudice under *Watson, supra*, 46 Cal.2d 818—i.e., the judgment should be reversed only if it is reasonably probable that the defendant would have obtained a more favorable result absent the error." (*People v. Garcia* (2008) 160 Cal.App.4th 124, 133.)

Respondent aptly directs our attention to *People v. Breaux* (1991) 1 Cal.4th 281, where the California Supreme Court disposed of a similar claim for lack of prejudice "[w]ithout deciding whether the psychiatrist's testimony fell within the proscription of section 29." (*Id*. at p. 303.) Frankly, we fail to see how the trial court's ruling could be construed as having diminished the import of Dr. Velosa's testimony. The expert testified that appellant suffered from bipolar disorder and was in the throes of a psychotic episode attributable to his mental illness at the time of the offense. Dr. Velosa's testimony clearly conveyed the opinion that appellant's symptoms would have impaired his ability to form rational thoughts or engage in meaningful reflection and deliberation. That opinion is supported by the video footage, which was the most compelling piece of evidence in the case. If a combination of the expert's insights and visual proof of appellant's mental instability was not enough to move the jurors to return a verdict of something less than premeditated murder, it is hard to imagine what else Dr. Velosa could have said to change their minds. We are confident, however, that the jury would have undoubtedly returned the same verdict had the challenged testimony not been stricken.

Murphy, 2016 WL 3885051, at *9–12 (footnote in original).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). However, a "defendant's right to present relevant evidence is not unlimited," and "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's

---

include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (§ 29.)

right to present a defense so long as they are not 'arbitrary' *or* 'disproportionate to the purposes they are designed to serve.'" <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998) (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 56 (1987)). The Supreme Court has recognized that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other facts such as unfair prejudice, confusion of the issues, or potential to mislead the jury." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326 (2006).

In <u>Clark v. Arizona</u>, 548 U.S. 735 (2006), the Supreme Court upheld the constitutionality of an Arizona state rule that limited consideration of mental illness and incapacity evidence to the affirmative defense of insanity and eliminated consideration of such evidence on the element of mens rea. As set forth in <u>State v. Mott</u>, 187 Ariz. 536 (Ariz. 1997), Arizona restricted consideration of mental disease evidence and capacity evidence "that characteristically comes only from psychologists or psychiatrists qualified to give opinions as expert witnesses." <u>Clark</u>, 548 U.S. at 760.

In upholding the constitutionality of the <u>Mott</u> rule, the Supreme Court recognized "Arizona's authority to define its presumption of sanity (or capacity or responsibility) by choosing an insanity definition . . . and by placing the burden of persuasion on defendants who claim incapacity as an excuse from customary criminal responsibility." <u>Clark</u>, 548 U.S. at 771. This authority includes the ability "to deny a defendant the opportunity to displace the presumption of sanity more easily when addressing a different issue in the course of the criminal trial." <u>Id.</u> For example, "just such an opportunity would be available if expert testimony of mental disease and incapacity could be considered for whatever a factfinder might think it was worth on the issue of mens rea." <u>Id.</u> Additionally, the Supreme Court found Arizona's rule reasonable in light of the risks raised by mental disease and capacity evidence, such as "the controversial character of some categories of mental disease," "the potential of mental-disease evidence to mislead," and "the danger of according greater certainty to capacity evidence than experts clam for it." <u>Id.</u> at 774.

Here, California Penal Code sections 28 and 29 are analogous to the <u>Mott</u> rule. In light of <u>Clark</u>, the California Court of Appeal's denial of Petitioner's due process claim regarding

limitation of the defense expert's testimony was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

### D. Sufficiency of the Evidence

In his fifth claim for relief, Petitioner asserts that there was insufficient evidence of premeditation and deliberation to sustain his first-degree murder conviction. (ECF No. 1 at 5). Respondent argues that the state court's denial of this claim was consistent with clearly established federal law. (ECF No. 12 at 53). This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 7, 8). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's sufficiency of the evidence claim, the California Court of Appeal stated:

*Standard of Review*
" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118.) The standard of review is "highly deferential" to the jury's verdict. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) It is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. This means if the evidence can reasonably be interpreted in more than one way, the appellate court cannot substitute its own conclusions for those of the trier of fact. (*People v. Millwee* (1998) 18 Cal.4th 96, 132.) In other words, "reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

*Count 1*
Appellant disputes the sufficiency of the evidence of deliberation and premeditation in connection with the verdict of first degree murder. His

arguments focus on the lack of proof regarding planning activity and/or a motive to kill for reasons other than self-defense. He further maintains that the evidence of "his judgment [being] clouded by severe mental illness" necessarily raised a reasonable doubt about his mens rea.

As a brief aside, we recognize that for many people the facts of this case will beg the question of how appellant could have been convicted of any crime greater than heat of passion manslaughter. The applicable law is summarized in *People v. Beltran* (2013) 56 Cal.4th 935: "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of *unconsidered reaction to the provocation*. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who *acts without reflection in response to adequate provocation* does not act with malice." (*Id*. at p. 942, fn. omitted, italics added.)

Being intentionally shot in the chest by anyone, much less your own father, surely constitutes adequate provocation for purposes of a heat of passion analysis. However, "[i]t is not enough that provocation alone be demonstrated." (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1015.) The jury must also be convinced that the defendant's ability to reason was in fact obscured by passion at the time of the killing. (*Ibid*.) " '[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter....' " (*People v. Breverman* (1998) 19 Cal.4th 142, 163.) The jury in this case may have accepted that appellant was provoked, but obviously believed he kept or regained the mental fortitude to refrain from killing his father.

The issue on appeal is not the presence or absence of provocation, but whether appellant deliberated and premeditated before firing the gun. Premeditation "encompasses the idea that a defendant thought about or considered the act beforehand." (*Pearson, supra*, 56 Cal.4th at p. 443.) Deliberation " ' "refers to careful weighing of considerations in forming a course of action." ' " (*Ibid*.) " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

The case law is replete with examples of deliberation and premeditation occurring during a short period of time. In *People v. Mayfield* (1997) 14 Cal.4th 668,[8] where the defendant wrested a gun from a police officer and shot the officer in the head during a brief altercation, it was held that "a rational trier of fact could conclude from the evidence that before shooting [the officer] defendant had made a cold and calculated decision to take [his] life after weighing considerations for and against." (*Id*. at pp. 767–768.) Likewise, in *People v. Mendoza* (2011) 52 Cal.4th 1056 (*Mendoza*), the high court found sufficient evidence of premeditation under circumstances where the defendant killed his victim within a few minutes of their initial encounter. (*Id*. at p. 1069–1074.) The *Mendoza* opinion also notes that a

---

[8] Disapproved on another ground as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.

single gunshot to the head can support the inference of a deliberate intent to kill. (*Id*. at p. 1071.)

Appellant's arguments purport to rely on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), which identifies three categories of evidence that are probative of deliberation and premeditation: proof of planning, motive, and the manner of killing. (*Id*. at pp. 26-27.) However, "[t]hese three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive." (*People v. Booker* (2011) 51 Cal.4th 141, 173.) Although not required to sustain the conviction, the record before us contains substantial evidence under each of three *Anderson* categories.

"[A] killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse." (*People v. Solomon* (2010) 49 Cal.4th 792, 813.) The most probative evidence of premeditation is found at approximately 18 minutes and 37 seconds into the August 10, 2013 video, when appellant says, "I'm gonna kill you. I'm gonna kill you." These words show that he "thought about or considered the act beforehand." (*Pearson, supra*, 56 Cal.4th at p. 443; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [defendant's statement of "Put the phone down or I'll kill you" was evidence of planning].) He does not shoot his father until nearly a minute later, when the video counter reaches 19 minutes and 33 seconds. In the interim, at 18 minutes and 40 seconds, appellant asks, "How did you get this gun?" The jury may have interpreted this question as indicating appellant had disarmed his father by that point in time, thus supporting its conclusion that the use of lethal force was unnecessary and gratuitous.

There was testimonial and photographic evidence which showed the victim was pummeled prior to being shot. Beginning at 18 minutes and 54 seconds into the video, the viewer hears at least four heavy blows being landed, with one of the impacts punctuated by appellant's statement of "Fuck you." This is followed by the distinct sound of appellant spitting, and one can't help but assume he is projecting saliva at his father. The audio paints a vivid picture in the mind's eye, which for the jury was the image of a man acting with cold, calculated malice. A full 33 seconds pass from that point until the moment when the fatal shot is fired.

Appellant insists there could have been no motive for killing his father other than self-defense. This argument ignores the obvious possibility of revenge, considering the victim had just tried to kill *him*. Incidentally, acting out of a passion for revenge does not reduce the crime of murder to manslaughter. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144; *People v. Williams* (1995) 40 Cal.App.4th 446, 453.)

In terms of how the crime was committed, appellant submits that "the manner of killing was not particular or exacting." He then contrasts the facts of this case with those in *People v. Nazeri* (2010) 187 Cal.App.4th 1101, where the defendant killed his wife and mother-in-law by stabbing each of them more than 20 times with a knife. (*Id*. at pp. 1103–1104.) The comparison is not helpful. Here we are concerned with evidence of an execution-style killing, i.e., death by a bullet fired from a gun placed directly against the victim's head. (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.) A killing of this nature is generally viewed as the quintessential example of deliberation and premeditation, albeit more so in cases where there is no evidence of a prior struggle. (*Ibid*; *People v. Romero* (2008) 44 Cal.4th 386, 401.) As stated in *People v. Lenart* (2004) 32 Cal.4th 1107, 1127, "an execution-

style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive."

Proof of appellant's mental illness does not override the evidence of planning and reflection. Although Dr. Velosa's testimony strongly supported a diminished actuality defense, the jurors were not required to accept his testimony as true or conclusive. (§ 1127b.) A jury "may disregard the expert's opinion, even if uncontradicted, and draw its own inferences from the facts." (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923; accord, *People v. Perez* (1992) 4 Cal.App.4th 893, 900 ["A jury is not required to accept the testimony of an expert witness even if he or she is the sole expert testifying at trial."].)

In summary, twelve jurors came to the unanimous conclusion that appellant thought about what he was doing before he killed his father, and was able to reflect upon his actions despite having symptoms of mental illness and a reason to feel provoked by what the victim had done to him. A different jury might have interpreted the facts another way, but the record does contain sufficient evidence of deliberation and premeditation. We must therefore affirm the conviction of first degree murder.

Murphy, 2016 WL 3885051, at *12–14 (footnote in original).

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 556 U.S. 1, 2 (2011). Moreover, when AEDPA applies, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The

1  federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

2  Id.

3     Under California law, "[m]urder that is premeditated and deliberated is murder of the first

4  degree." People v. Pearson, 56 Cal. 4th 393, 443 (Cal. 2013) (internal quotation marks and

5  citation omitted). "An intentional killing is premeditated and deliberate if it occurred as the result

6  of preexisting thought and reflection rather than unconsidered or rash impulse." Id. (internal

7  quotation marks and citation omitted). "Premeditation and deliberation can occur in a brief

8  interval. The test is not time, but reflection. Thoughts may follow each other with great rapidity

9  and cold, calculated judgment may be arrived at quickly." People v. Mendoza, 52 Cal. 4th 1056,

10  1069 (Cal. 2011) (internal quotation marks and citations omitted).

11     As noted by the California Court of Appeal, at approximately 18 minutes and 37 seconds

12  into the August 10, 2013 video, Petitioner states, "I'm gonna kill you. I'm gonna kill you." At 18

13  minutes and 40 seconds, Petitioner asks, "How did you get this gun?" Beginning at 18 minutes

14  and 54 seconds, at least four heavy blows being landed are clearly audible. Petitioner then says,

15  "Fuck you," and audibly spits. Thirty-three seconds later, Petitioner shot his father. (Lodged Disc

16  1). The pathologist testified at trial that the decedent suffered blunt force trauma to his head and

17  body, resulting in multiple contusions, abrasions, and lacerations. (5 RT 364–80). The

18  pathologist concluded that these "significant" injuries indicate the decedent was struck multiple

19  times before his death. (5 RT 380–81). The pathologist also testified that there was a "muzzle

20  imprint" on the side of the decedent's head, indicating that the gun was pressed up on the skin

21  when the shot was fired. (5 RT 384–85). Apart from injuries related to his gunshot wounds,

22  Petitioner was not found to have any other injuries. (5 RT 430; 6 RT 616–17, 619, 621–22).

23     Viewing the record in the light most favorable to the prosecution, a rational trier of fact

24  could have found true beyond a reasonable doubt that Petitioner acted with premeditation and

25  deliberation. As noted by the California Court of Appeal, the jury reasonably could have

26  interpreted Petitioner asking his father, "How did you get this gun?" as indication that Petitioner

27  had taken the gun from his father at 18 minutes and 40 seconds into the video. The jury also

28  reasonably could have inferred that Petitioner spit at his father. Further, the jury reasonably could

have interpreted the decedent's multiple injuries and Petitioner's lack of injuries apart from those related to his gunshot wounds as indicating that the fight leading up to Petitioner shooting his father was one-sided. Therefore, the jury reasonably could have concluded that when Petitioner shot his father 56 seconds after declaring, "I will kill you," 53 seconds after asking "How did you get this gun?" and 33 seconds after stating, "Fuck you," and spitting, that Petitioner acted as a result of preexisting thought and reflection with unjustified lethal force.

Even if this conclusion is debatable, "'[a]fter AEDPA, we apply the standards of Jackson with an additional layer of deference' to state court findings." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration in original) (quoting Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). Under this doubly deferential standard of review, the state court's denial of Petitioner's sufficiency of evidence claim with respect to premeditation and deliberation was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fifth claim, and it should be denied.

## IV.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling

pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **June 30, 2017**  _____ /s/ Erica P. Grosjean _____

UNITED STATES MAGISTRATE JUDGE